Guillermo **ROSARIO NEVAREZ,** et al., Plaintiffs,

v.

Jaime **TORRES GAZTAMBIDE,** et al., Defendants.

Civ. No. 85–1117 HL.

United States District Court, D. Puerto Rico.

March 31, 1986.

Frank Rodríguez García, Ponce, P.R., for plaintiffs.

Carlos del Valle, Ramirez & Ramirez, Edificio Tres Rios, Hato Rey, P.R., for defendants.

## OPINION AND ORDER

LAFFITTE, District Judge.

This Court is again faced with a patronage demotion case under 42 U.S.C. § 1983, instituted by Guillermo Rosario Nevarez and his wife, Elsie Nieves Reyes, against the Secretary of Housing, Jaime Torres Gaztambide, and the Executive Director of the Rural Housing Administration

("RHA"), Cosme Hernández Silva, and their respective wives.[1]

Plaintiff Rosario's claim is rooted in the First and Fourteenth Amendments to the Federal Constitution. He claims that his demotion from Regional Director in the RHA, where he earned a monthly salary of $1,388, to Rural Community Administration Technician, with a monthly salary of $755, was unlawfully motivated by party politics. Plaintiff seeks reinstatement to his previous position and compensatory and punitive damages. Defendants deny partisan considerations in demoting plaintiff, but assert that even if politics were a consideration, plaintiff's political affiliation is an appropriate requirement for the effective performance of a Regional Director at RHA.

A non-jury trial was held on January 13, 14, 15, 16, and 17, 1986.[2] Based on the testimony heard and the evidence submitted we find that plaintiff's demotion was motivated solely by party politics and that political affiliation is not an appropriate requirement for plaintiff's position of Regional Director of the Rural Housing Administration.

## I. FACTS.

Plaintiff, Guillermo Rosario Nevarez, is a member of the Partido Nuevo Progresista ("PNP"). Defendants are members of the Partido Popular Democrático ("PPD"). After eight years of PNP administration, the PPD recaptured the governorship in the 1984 election. The new administration was inaugurated on January 2, 1985. Defendants Jaime Torres-Gaztambide was appointed Secretary of Housing and Cosme Hernández-Silva was appointed Executive Director of the Rural Housing Authority, an administration within the Housing Department.

Plaintiff's membership in the PNP is a well known fact. From 1976 to 1980 plaintiff served as PNP Electoral Commissioner for precinct 23, Morovis. Defendant, Hernández-Silva was aware of plaintiff's PNP affiliation. Hernández Silva has also worked within RHA since 1963. Prior to 1985, plaintiff and Hernández-Silva had discussed their respective party affiliations.

Plaintiff entered public service in 1975 as an employee for the Department of Social Services. Since 1978 he has worked in the Rural Housing Administration ("RHA"). He was first assigned to RHA as a local supervisor of the Morovis office. In 1983 he was appointed RHA Regional Director of the Arecibo region, a position he held until his demotion in March, 1985. The Regional Director of RHA is classified under the law of Puerto Rico as a position of trust and confidence. 3 L.P.R.A. sect. 1349. During his tenure as a public employee plaintiff has never been disciplined or reprimanded for any reason.

RHA is an administration within the Department of Housing;[3] the Urban Renewal Housing Corporation is another. The main purpose of RHA is to implement and develop relocation for "agregados"[4] and to con-

---

**1.** The status of plaintiff and defendants' wives as parties to this action is discussed separately below.

**2.** Defendants had also raised in the Pre-trial Order the defenses of qualified immunity and that plaintiff's appointment to the position of Regional Director was null and void. No evidence was produced as to either defense and they are, therefore, deemed waived.

**3.** The Rural Housing Administration was the former Social Program Administration attached to the Land Authority, 28 L.P.R.A. sect. 521. In 1972 all functions, programs and activities of the Social Program Administration were transferred to the Secretary of Housing. 3 L.P.R.A. sect. 441d(b). In 1978 the name "Land Authori-

ty's Social Program Administration" was changed to "Rural Housing Administration."

**4.** "Agregados" is defined in 28 L.P.R.A. sect. 885 as follows:

For the purpose of this act, the term *agregado* shall be understood to mean any family head and those single persons who qualify, residing in the rural zone, whose home is established in a house and on land belonging to another person or in his own house erected on land belonging to another person, and whose only means of livelihood is his labor for a wage earned from agricultural tasks and who does not possess land as owner. Nor more than a parcel shall be granted to any family head and those single persons who qualify therefor, nor shall such family head or

struct housing in rural communities. To facilitate this purpose RHA administers a program of raffling off lots for $1.00 to low-income families in rural areas. The lots are raffled according to RHA regulations and procedures designed to assure the highest degree of fairness and avoid favoritism. Families who receive lots are required to construct a home and to live there. RHA also administers its own construction program under which qualifying individuals may purchase a dwelling with government assistance.

The Central RHA Office, located in San Juan, is composed of an Executive Director, Deputy Director, and two Program Directors. There are five divisions within the agency; property titles adjudication, community development, surveying, sports, and improvements. There are 10 RHA Regional Directors who receive orders from the Executive Director. In each region RHA employs approximately 30 to 35 individuals. Though the Regional Director is technically the head of the RHA employees in the region, many employees working in RHA regions receive their instructions directly from the Central Office. RHA Programs are administered chiefly by the staff in the Central RHA Office.

RHA Regional Directors do not meet directly with the Secretary of Housing. They do meet with the Executive Director either individually or as a group.[5] At budget-making time, the Regional Directors will give the Executive Director suggestions as to their office and hiring needs. This, however, is the extent of their input to the budget. Budgetary determinations, both proposals and implementation, are handled by the Central Office. The Regional Directors also make suggestions as to which properties in their region RHA should purchase and develop. Two consid-

erations given priority when purchasing property are the density of the low-income population and the area's infrastructure. Again the ultimate decision on property acquisition rests with the Central Office and the Secretary of Housing.

The basic responsibility of RHA Regional Directors is to supervise the operation and administration of RHA programs at the District level. The Regional Director holds training sessions for RHA employees to explain the RHA programs. They visit the local RHA offices to assure that the programs are operating correctly and to attend to administrative problems. Occasionally, they may meet with the local mayors or other community members to promote RHA programs or to handle complaints. Applications for the RHA lot distribution program are collected at the regional office and certified for eligibility. However, the list is sent on to the Central Office where it is screened and a final certified list is prepared. At trial, Hernández-Silva admitted that membership in the PPD was not a requirement to be able to perform the job of Regional Director.[6]

On March 18, 1985 plaintiff was formally demoted from the position of Regional Director of the Arecibo region. However, on January 30, 1985, when Hernández-Silva, the newly appointed RHA Executive Director, visited plaintiff's office in Arecibo, plaintiff received a *de facto* demotion. At this meeting Hernández informed plaintiff that he had no trust in him "personally or politically" and that Ana Yolanda González, an employee under plaintiff's supervision and a PPD member, would be in charge of the office. Hernández told plaintiff that he would retain the title of Regional Director until Hernández decided "what to do with

single persons convey said parcel without the consent of the Rural Housing Administration, under such regulations as the Rural Housing Administration may approve.

5. It is apparent that no confidential information or policymaking decisions are discussed between the Regional Directors and the Executive Director. In fact, while Hernández-Silva was in

a career position, as Director of the RHA Property Title Division under the PNP administration, he attended group meetings between the Regional Directors and the RHA Executive Director.

6. See Appendix A, List of Duties of RHA Regional Directors, OP 16 Letter.

all the Republican Regional Directors."[7] Hernández further stated that since plaintiff was classified as an employee of trust and confidence, no reasons had to be given in order to demote him.

Accordingly, on March 18, 1985, plaintiff was handed a demotion letter signed by defendants, Torres-Gaztambide and Hernández-Silva. The latter gave no reasons for the demotion. It stated simply:

Pursuant to the powers vested on me by Act No. 5 of October 4, 1975, as amended, known as the Public Personnel Act, which in its Section 5.10 establishes that "employees in trust positions shall be of free selection and removal", I hereby inform you that starting on March 15, 1985, I will not be requiring your services as Regional Director. (Our translation.)

Plaintiff was demoted to the position of a Rural Community Administration Technician III. The demotion carried a monthly reduction in salary of $633 from $1,388 to $755. Ricardo Nieves, who told plaintiff he was a member of the PPD, was appointed Regional Director of the Arecibo region.

Between January 30 when Hernández-Silva visited the Arecibo office and March 18 when plaintiff was officially demoted, the central RHA office and Yolanda González made plaintiff aware that he no longer had any authority as Regional Director. The day after the January 30 meeting between Hernández-Silva and plaintiff, plaintiff gathered the RHA employees at the Manati office to inform them Yolanda González was to be in charge of the office.[8] While plaintiff was holding this meeting the telephone wire of his phone at the Arecibo office was cut. Yolanda González admitted that she ordered the phone disconnected. However, no official disconnect notice was submitted by the Central RHA Office and plaintiff's phone was reconnected by a supervisor of the Puerto Rico Telephone Co. on February 5, 1985. When they came to reinstall the phone, Yolanda González told them defiantly to go ahead, that Hernández-Silva would order it disconnected. On February 28 plaintiff's phone, as predicted, was disconnected upon orders from the Central Office.

Following his official demotion, on March 18, 1985, plaintiff left on vacation. When he returned he found his office dismantled and his personal belongings packed. Plaintiff was assigned no office, desk or chair to sit on. Yolanda González would poke fun at him saying "poor fellow, now you don't have a chair to sit on." It was not until November, 1985 that plaintiff was allowed to retrieve an old discarded office desk and chair which he painted himself with paint provided by fellow employees.

With the exception of some ad hoc tasks, such as handing out the agency newspaper in rural communities, plaintiff was assigned no duties.[9] Before he got a desk, plaintiff recounted that he would spend his time walking around the office or would sit in the reception area when he got tired.

After plaintiff was already demoted, Hernández-Silva ordered an investigation to determine whether plaintiff had exchanged an RHA lot for a horse. The new Arecibo Regional Director, Ricardo Nieves; the Mayor of Morovis, a PPD member, and another RHA employee, interviewed José Miguel Santiago, a holder of an RHA lot, about this subject. Santiago told Nieves and the Mayor that he had obtained his lot in accordance with RHA procedures, and that no swap of the lot for a horse had

7. Plaintiff testified that defendant had referred to PNP members as "republicans" in the past. Plaintiff also testified that other Regional Directors affiliated with PNP were removed from their positions around the same time he was officially demoted.

8. At this meeting Ana Yolanda González bragged about her future appointment as Regional Director. Although she did not get the appointment, the record shows that as early as February 2 and 5, 1985, she had signed and received memos as "Acting Regional Director." Ricardo Nieves, another PPD member, ultimately replaced plaintiff as Regional Director.

9. Defendants contend plaintiff was assigned no functions because he was always absent. The record shows that plaintiff was absent 111½ days from January to November 1985. Much of this time was spent on sick leave under the care of the State Insurance Fund.

taken place; that he had never entered into any such scheme. Santiago testified that Nieves pressured him to be a witness against the plaintiff but he refused. Instead, he went immediately and told the plaintiff what had happened. Plaintiff was publicly humiliated and testified that he was particularly devastated by this story that the Regional Director and the Mayor of Morovis were accusing him of using his former position for fraudulent purposes.

Plaintiff is married and is the father of five children. The humiliation and vexation plaintiff experienced being demoted from the position of RHA Regional Director to a career position in which he was assigned no substantive tasks and provided no office space, was even greater than the impact would have been had he been discharged. Rosario Fernández Garcia, an employee at the Arecibo Regional Office, testified that all the employees in the office felt sorry for plaintiff. Once he was a lively, alert person, Fernández testified, but now is a "changed man." Plaintiff suffered severe mental anguish, stress, tension, insomnia, depression and loss of weight.

Plaintiff testified that his asthmatic condition has exacerbated. He now takes medication for asthma which was never before necessary. While plaintiff's wife was testifying that her husband's demotion and accompanying events had not only had a severe effect on his emotional state but also on the financial and emotional well-being of the family, plaintiff began crying and left the courtroom in order to regain his composure.

## II. FIRST AMENDMENT LIMITATIONS ON THE DISCHARGE OR DEMOTION OF PUBLIC EMPLOYEES.

■ Defendants claim that plaintiff's classification under the Public Service Personnel Act of Puerto Rico as an employee of trust and confidence, 3 L.P.R.A. sect. 1349, permits them to dismiss or demote plaintiff for any reason, including political affiliation. Defendants' reliance on Puerto Rico's Personnel Law is misplaced. The Supreme Court of the United States has recognized that public employees are protected by the First Amendment freedom of speech and association from being discharged or demoted solely because of political affiliation, unless party affiliation is an acceptable requirement for the particular government position. *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). This First Amendment protection cannot be legislated away by Puerto Rico's Personnel Act. *See Colon v. Cruv*, 84 JTS 52 (P.R. 1984); *Clemente v. Depto. De La Vivienda*, 114 D.P.R. 763 (P.R.1983); *Ramos Villanueva v. Cintron*, 82 JTS 556 (P.R. 1982). *See also, Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

■ Once a plaintiff to a sect. 1983 action establishes that a motivating factor for his discharge or demotion from a government position was political affiliation, defendant has the opportunity to defeat plaintiff's claims by demonstrating that: 1) plaintiff would have been discharged or demoted in any event, *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); or 2) that political affiliation is an appropriate requirement for the job. *Branti, supra.*

In this case, plaintiff has clearly established that his association with the PNP was the motivating factor for his demotion. Given the heated political situation in Puerto Rico, the Puerto Rico Supreme Court has found that a strong inference of political discrimination exists when an individual affiliated with one political party is replaced by a member of the other party currently in power. *Colon v. Cruv, supra; Navedo v. Municipio De Barceloneta*, 113 D.P.R. 421 (1982); *Baez Cancel v. Mayor of Guaynabo*, 100 D.P.R. 980 (1972). We concur. In January, 1985, when Hernández-Silva visited the RHA Arecibo office,

plaintiff was told that Ana Yolanda González, an employee under plaintiff and a PPD member, would be in charge of the office. Following plaintiff's official demotion, he was permanently replaced by a member of the PPD, Ricardo Nieves. Furthermore, Hernández-Silva, the PPD Executive Director of RHA told plaintiff unabashedly that he had no trust in him "personally or politically" and that no reasons had to be given for plaintiff's demotion because he was classified an employee of trust.

## A. "BUT FOR" POLITICAL DISCRIMINATION.

■ Cases of political discharges allegedly in violation of the First Amendment have applied the standard established by the Supreme Court in *Mt. Healthy, supra,* and *Givhan, supra. See Barnes v. Bosley,* 745 F.2d 501, 506–08 (8th Cir.1984); *Jones v. Dodson,* 727 F.2d 1329, 1335 (4th Cir. 1984); *Nekolny v. Painter,* 653 F.2d 1164, 1166–1168 (7th Cir.1981). Under this test an employer may escape liability for a First Amendment violation by establishing that the employee would have been demoted or dismissed in any event for valid reasons. *Mt. Healthy, supra,* 429 U.S. at 297, 97 S.Ct. at 576; *see also, Givhan, supra,* 439 U.S. at 417, 99 S.Ct. at 693.

This case presents no doubt that plaintiff would not have been demoted were it not for his affiliation with the deposed PNP. Prior to the day of trial plaintiff was never presented with charges against him or reasons for his demotion. The official demotion letter, effective March 15, 1985, stated simply that plaintiff was demoted pursuant to the "powers vested in [the Secretary of Housing] ... by the Public Personnel Act." At trial, however, defendants attempted to argue that they had substantive reasons for demoting plaintiff. They presented for the first time a list of three charges: 1) while Regional Director, plaintiff allowed residents from areas other than El Ensanche to move into homes in the El Jobos sector; 2) plaintiff's daughter acquired two RHA lots in violation of RHA regulations; and 3) plaintiff exchanged an RHA lot for a horse. Based on the testimony at trial and the documentary evidence presented each charge is dismissed as an unsubstantiated afterthought.

Concerning the charge that plaintiff allowed residents other than those from El Ensanche to move into the El Jobos sector, Antonio Diaz Neval, the Executive Director of RHA until December 31, 1984, testified that he authorized plaintiff to take this action. Wooden homes had been built by RHA at El Jobos for El Ensanche residents because the embankment on which the El Ensanche community was located had become dangerous. Diaz Neval explained that some El Ensanche residents refused to move from their homes. In order to prevent the El Jobos dwellings from remaining vacant and becoming vandalized, he authorized the homes to be offered to Manati residents. Hernández-Silva admitted he had never investigated whether plaintiff's actions were authorized. When asked why he had failed to bring this charge to plaintiff's attention earlier, he responded that it was a "minor" irregularity.

As to the charge that plaintiff's daughter acquired two RHA lots, the documentary and testimonial evidence is conclusive that no illicit conduct existed. Plaintiff's daughter and her first husband acquired lot No. 274 from RHA. When she divorced, she surrendered this lot back to the agency. The lot was later transferred to another individual. Upon remarriage plaintiff's daughter and her new husband, following all RHA procedures, acquired a new lot.[10] No money was exchanged in any of these transfers and no one stood to reap a profit.

The third charge, that plaintiff swapped a horse for a lot, is the most outrageous,

---

10. Defendant Hernández-Silva conceded in his testimony that plaintiff's daughter and her husband belonged to that economic class for which the rural housing program is aimed, and that the documentation was executed in the usual manner and within the normal period for similar cases.

offensive and unwarranted of the charges. Defendant Hernández-Silva ordered an investigation of this matter and allowed the PPD Mayor of Morovis to participate. Following the investigation, the RHA Regional Director and the Mayor were assured that no such unlawful transaction had occurred. Despite the fact that defendants had no evidence to support this spurious charge and never provided plaintiff an opportunity to respond, they continued to present the charge at trial. If defendants' objective were to further humiliate and embarass plaintiff, they accomplished their goal. It takes little imagination to infer that bringing the PPD Mayor of the small rural town of Morovis into this sordid investigation was effective to funnel the matter through the gossip pipelines. This incident evidences the complete lack of sensitivity and circumspection with which defendants have handled this demotion.

## B. POLITICAL AFFILIATION AS AN APPROPRIATE REQUIREMENT FOR THE JOB.

█ The Supreme Court has recognized that party affiliation is an acceptable requirement for some government positions when the need for party loyalty of employees outweighs the employees' First Amendment rights. *See Branti, supra; Elrod, supra.* *Elrod* limited permissible patronage dismissals to employees in "policymaking" positions and "confidential" positions. In a second opinion on this subject, *Branti, supra,* the Supreme Court abandoned the labels "policymaker" and "confidential employee." The Court reasoned that those positions for which party affiliation is an important and legitimate consideration and those labeled "policymaking" or "confidential" are not necessarily coextensive.[11] In conclusion the Court held:

The ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather the question is whether the hiring authority can dem-

onstrate that party affiliation is an appropriate requirement for effective performance of the public office involved. *Branti,* 445 U.S. at 518, 100 S.Ct. at 1295.

Differing interpretations of *Branti* have been adopted by the courts. The Fourth Circuit in *Jones v. Dodson, supra* at 1329, found the *Branti* standard to be an "extremely narrow ... justification: that affiliation with the public employer's political party [must be] essential to the employees effectiveness in discharging the responsibilities of the position held." The Eighth Circuit interpreted the *Branti* formulation as an inquiry into whether plaintiff's "political viewpoints would influence policymaking areas," from the position he held with the government. *Barnes, supra* at 508. In *Ness v. Marshall,* 660 F.2d 517, 520 (3rd Cir.1981), the court admitted that the guidelines provided by *Branti* are limited, but stated "we would at least conclude that should a difference in party affiliation be highly likely to cause an official to be ineffective in carrying out the duties and responsibilities of the office, dismissals for that reason would not offend the First Amendment." The Seventh Circuit formulated its own test based on the *Branti* decision: "whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decision-making on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981). The Supreme Court of Puerto Rico has also applied *Branti* to hold that employees in positions of trust and confidence, as defined by the Personnel Act of Puerto Rico, may not be discharged for political reasons, unless the incumbent's political affiliation is a legitimate factor for effective performance of the public office involved. *Colon, supra* (Regional Managers of *Cruv* held political affiliation not an appropriate requirement); *Ramos Villanueva, supra* (Di-

---

11. The Court cited an election commissioner as an example of a position which is appropriately considered political even though it is neither confidential or policymaking. The position of a

football coach at a state university was cited as a policy-making position for which politics is not relevant to the job.

rector of Aguadilla Region for the Commerce Department held political affiliation not an appropriate requirement); *Clemente, supra* (Regional Directors of *Cruv*, Mayaguez region, held political affiliation not an appropriate requirement).

Whatever the legal interpretation given to *Branti,* the common thread running through the political discharge decisions is the functional approach taken by the courts. The facts of each case are considered in detail. Among the factors taken into account when applying the *Branti* standard are those factors set out by the Supreme Court in *Elrod:* whether the employee's responsibilities are vaguely defined or of broad scope indicating a policymaking position, and whether the employee acts as an adviser or formulates plans for the implementation of broad goals. *Elrod,* 427 U.S. at 367–68, 96 S.Ct. at 2686–87.

Two cases in particular, highlight the application of *Branti* and the applicable factors we must consider to determine whether political affiliation is an appropriate requirement for plaintiff's job as RHA Regional Director: *Tomczak v. City of Chicago,* 765 F.2d 633 (7th Cir.1985) and *Colon v. Cruv, supra.*

The plaintiff in *Tomczak* was the First Deputy Commissioner of the Water Department for the City of Chicago. The court held that plaintiff's position was not protected by the First Amendment. Important factors for this decision were the fact that plaintiff worked in the Central Office of the Water Department, directly under the Commissioner. While the Commissioner was absent plaintiff served as Commissioner. Plaintiff received the second highest salary in the department, he was in charge of the department's budget, he was responsible for hiring and firing certain employees and he had important input into Department policy. The court concluded that party association was an appropriate requirement for this job. In the court's view plaintiff was not a ministerial employee; his position carried the power and authority to "frustrate the administration's

policies." *Tomczak, supra,* at 639, 641–50.

In COLON, plaintiffs held the positions of Ponce District Manager of the Corporación de Renovación Urbana y Vivienda ("*Cruv*"), General District Supervisor of *Cruv* for the Caguas Office, and General District Supervisor for the *Cruv* Humacao office. These positions were classified as confidential under Puerto Rico law. The plaintiffs belonged to the PNP and were dismissed by the PPD administration and replaced by PPD members. The Supreme Court of Puerto Rico concluded that despite their "confidential" classification the government had failed to demonstrate that party affiliation was an appropriate requirement for the job.

A comparison of the job description for the positions held by the *Colon* plaintiffs and the job description of the position held by plaintiff in this action reveals that the *Colon* plaintiffs were the functional equivalent in *Cruv* to plaintiff's position as Regional Director in RHA. The major responsibility of the *Colon* plaintiffs as *Cruv* Regional Managers was to "plan, organize, assign and supervise" *Cruv* programs at the district level. Similarly, here, plaintiff was responsible for the administration and operation of RHA programs in his districts.

In support of their defense that the position of RHA Regional Director is unprotected by the First Amendment, defendants promote the argument that the Regional Director has responsibilities which require him to represent the agency in his particular region, such as meeting occasionally with local mayors or appearing before the community with government officials to explain the housing programs. The evidence in this case indicates that these responsibilities were minimal. Furthermore, the *Colon* plaintiffs, as Regional Managers for *Cruv*, had these same responsibilities yet the Puerto Rico Supreme Court held that party affiliation was not an appropriate requirement for their positions. We agree that those limited occasions when the RHA Regional Director may be called upon to represent the agency in the community do

not convert his position into one in which party association is an appropriate requirement.

We cite with aghast another argument made by defendants in support of their defense. Hernández-Silva testified that a policy of RHA was to purchase land and develop communities on the basis of the political criteria of party affiliation and improving party image. By this testimony defendants imply that RHA Regional Directors must be of their same party to promote and implement this policy. The court is nonplussed that defendants would consider defending a constitutional violation with an argument based on an unconstitutional criteria. The purpose of RHA is to service the housing needs of low-income people living in rural areas. Political affiliation and improving party image are absolutely inappropriate criteria to be mixed with this objective. The plight of the homeless in rural Puerto Rico is color blind.[12]

To paraphrase the conclusion of the Seventh Circuit in *Tomczak* we find that plaintiff was in a managerial position and that the power and authority of his position was insufficient to frustrate the policies of the government if the responsibilities of his position were properly carried out. Plaintiff's office was located in Arecibo, not in the Central RHA Office in San Juan. Superior to plaintiff in the Housing Department hierarchy was not only the Secretary of Housing and RHA Executive Director, but also the RHA Deputy Executive Director.

The evidence establishes that the RHA administration was highly centralized. Though plaintiff, as Regional Director, was technically the head of 30 to 35 RHA employees in the region, most of the employees working in RHA regions received their instructions directly from the Program Director or Executive or Deputy Director at the Central Office. Though the Regional Directors met with the Executive Director to give suggestions on the RHA budget, where RHA should purchase and develop land and other RHA policy, all budgetary, land acquisition and policy decisions were decided centrally. The Regional Office would collect and certify a list of individuals applying for the RHA lot distribution program, but this list was passed on to the Central Office where it was screened and a final certified list was prepared. Even an order to have a phone disconnected at a Regional office had to be submitted by the Central Office before action could be taken.

We find that defendants had no legitimate reason to demote plaintiff and that political affiliation is not an appropriate requirement for the position of RHA Regional Director. Undoubtedly political differences exist between plaintiff, as a member of the PNP, and defendants, members of the governing PPD party. By their nature, political parties have differing priorities and goals for the development and implementation of government social and economic programs. Individuals choose one party over the others, in large part, because they prefer the political ideology of that party.

As RHA Executive Director, defendant Cosme Hernández-Silva along with defendant, then Secretary of Housing, Jaime Torres-Gaztambide, and the RHA Deputy Executive Director are in the position of formulating RHA policy for servicing the housing needs of low-income people in rural areas in keeping with the PPD political philosophy. As a member of the opposing PNP, it may be assumed that plaintiff would not necessarily agree with the priorities of RHA policy. However, as Regional Director, plaintiff was not in a position to shape RHA policy. His job was to accept the decisions made by the policymakers in the Department of Housing and to super-

---

**12.** Defendants also presented an expert in private business consulting who testified that a superior must have utmost trust in his subordinates to insure that orders and programs are carried out. Certainly, this is desired in the best of all possible worlds. However, this testimony is irrelevant to the test formulated in *Branti* of political association as an appropriate requirement for the job. Furthermore, Hernández-Silva admitted on cross-examination that membership in the PPD was not a requirement for the job of RHA Regional Director.

vise the administration and organization of the RHA programs as designed by the Central Office. So as not to appear naive, we conclude by quoting, in full agreement, an observation made by the Puerto Rico Supreme Court in the context of political discrimination cases in the Commonwealth:

> On the other hand, the highly charged political climate that unfortunately prevails in our country and permeates all governmental functions prevents us from discarding the possibility that, in a specific case, an employee not affiliated with the political party in power may turn his back on the requirements of his functions as a public servant. If the situation should arise, the determination as to the validity of his removal or dismissal should be made while taking into consideration, among other circumstances—and aside from the fact that he may be a confidential employee—the opportunity that he has had under the new administration to show, within a reasonable term, that his competence, efficiency, and loyalty to public service axioms have not been affected and are above his personal political preferences.

*Colon, supra,* at 3628.

### III. RELIEF

■ Defendants in this case are not entitled to a qualified immunity excepting them from liability for damages. It follows, as a matter of course, that plaintiff is entitled to all relief, for which there is proof, available to a prevailing plaintiff in a section 1983 action. Under the proper circumstances a prevailing plaintiff may be awarded injunctive relief in the form of reinstatement to the position previously held. *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). As damages, prevailing plaintiff is allowed compensatory damages, *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Fernandez v. Chardon*, 681 F.2d 42, 60 (1st Cir.1982), including damages for emotional distress, *Carey v. Piphus*, 435 U.S. 247, 263–64, 98 S.Ct. 1042, 1052–53, 55 L.Ed.2d 252 (1978). Plaintiff is also entitled to punitive damages when defendant's conduct involves a callous indifference to plaintiff's federally protected rights or when defendant's conduct is motivated by malicious intent, or evil motive. *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *Irizarry v. Quiros*, 722 F.2d 869 (1st Cir.1983).

■ Plaintiff, Guillermo Rosario Nevárez, is hereby ordered reinstated forthwith to the position of Regional Director for the RHA Arecibo office.

As compensatory damages, plaintiff, Rosario Nevárez, is awarded $7,596.00 in back wages. He was demoted from the position of Regional Director effective March 20, 1985. From that date until the present, 12 months, plaintiff received a $633 per month reduction in salary.

Plaintiff is further awarded $20,000.00 as actual damages for emotional and mental distress and the aggravation of his asthmatic condition. *Flores Caraballo v. Lopez*, 601 F.Supp. 14 (D.C.P.R.1984). Plaintiff experienced greater humiliation, stress and anxiety in being demoted than he would have, had he been discharged completely. Once the person with the title and authority of Regional Director, plaintiff had to return to work day-after-day to a position in which he was assigned such tasks as distributing the community newspaper in rural towns. He had no office, no desk and no chair. Where once he went to the Arecibo Office as the chief in command, he now went to be subjected to the ridicule of his former subordinate, Ana Yolanda González. Though the other RHA employees at the Arecibo office were more charitable, it certainly was mortifying for plaintiff to face them daily, given his situation. Furthermore, it goes without saying that the loss of wages following plaintiff's demotion had a severe effect not only on his financial well-being, but also his emotional health. *See Loudermill, supra,* 105 S.Ct. at 1497 (Marshall concurring).

Plaintiff testified that his bronchial asthmatic condition had worsened following his demotion, requiring him to be placed on new medication. The parties stipulated

that plaintiff's doctor would testify that his condition was exacerbated due to the stress he experienced from the demotion, and defendants' expert would testify that bronchial asthma is an organic condition which is not affected by outside pressure. This issue was then submitted to the court. Though no conclusive tests have been done, it is believed by the medical community that asthma may be aggravated by emotional factors. Kalisch-Williams, *Courtroom Medicine, Chest, Heart and Lungs*, sect. 11 B.13, 14 (1985).[13]

We further award plaintiff $10,000.00 in punitive damages against Cosme Hernández-Silva. We point to the conduct of Hernández-Silva ratifying Yolanda González' order to disconnect plaintiff's phone prior to his official demotion, ordering an investigation of plaintiff into a spurious charge and permitting the Mayor of Morovis to participate in the investigation. Though Hernández-Silva denied knowledge of plaintiff's abused situation at the Arecibo office, it is hard for us to believe that in such a small administration the Executive Director was not aware of the activities at the Regional Office.

Against Jaime Torres-Gaztambide $5,000 in punitive damages is awarded. The Court notes that a pattern of discrimination exists within the Housing Department. *See Jimenez Fuentes v. Gaztambide*, 85–1110 (Acosta, Judge), and *Jose Vicente Vazquez*, 85–1225 (Acosta, Judge), Order Aug. 6, 1985; *Hiram Collazo v. Gaztambide*, 85–1116 (Acosta, Judge), Opinion and Order February 12, 1986. Punitive damages are assessed herein in an effort to deter political discrimination in public employment by government officials.

Political discrimination is pervasive in Puerto Rico[14] and irrationally permeates public administration. In awarding punitive damages we heed the words of learned Associate Justice Negrón-Garcia in *Colon supra*, at 3628–29:

> The courts must break the trend and vicious circle established on the island, of substituting government personnel, after each general election, on grounds foreign to a sound public administration; the political patronage and spoils the system. *Olivieri Morales, supra*. The scenario recurs each time there is a change in the political party in power. The adverse consequences are fatal and alarming: the reduction of funds is substantial. It is a judicially recognized fact that payment of these types of judgments results in a financial crisis and have a negative impact on the budget. It constitutes a substantial detouring of public funds in detriment to the essential public services, independently from the recipient's political affiliation. The courts must exhaust all resources to design dissuasive remedies.[3]

---

[3] The situation is critical and calls for an urgent remedial judicial creativity.[15]

**13.** Our award of $20,000 in damages for mental and emotional distress is distinguishable from *Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir.1977), where the First Circuit overturned the district court award of $10,000 for emotional distress in the case of a constructive discharge. There, the court based its ruling, in part, on its finding that the District Court failed to apply the proper standard to determine whether plaintiff was constructively discharged. Furthermore, the court found that the plaintiff's embarrassment and humiliation could have been avoided had she taken the job in a distant office assigned to her.

Here, plaintiff could not have avoided the humiliation and abuse he experienced. In fact, defendants placed him in a position which exaggerated his feelings of degradation. In addition, plaintiff has produced medical evidence that he suffered more from emotional distress; his asthmatic condition was aggravated due to the humiliation, anxiety, insomnia, loss of weight and stress following his demotion.

**14.** More than 200 political discrimination actions under 42 U.S.C. § 1983 have been filed in this court following the last general elections, as per certification of the Deputy Clerk of this Court, annexed to this Opinion and Order as Appendix B.

**15.** Should punitive damages prove to be insufficient to further deter these pernicious practices, perhaps the next step should be the initiation of criminal charges under 18 U.S.C. § 242, the criminal counterpart of 42 U.S.C. § 1983.

## IV. STANDING OF PLAINTIFF'S WIFE AND OF THE CONJUGAL PARTNERSHIP.

■ Plaintiff's wife, Elsie Nieves, and the conjugal partnership of Guillermo Rosario Nevarez and Elsie Nieves are also plaintiffs in this action. Elsie Nieves and the conjugal partnership claim to have standing in the action to recover relief for injuries they suffered when Guillermo Rosario was demoted from his job in violation of his civil rights. We find that both these plaintiffs lack standing and dismiss them from the action.

A section 1983 plaintiff has standing to sue if he establishes he has suffered or will suffer injury-in-fact, economic or otherwise, sufficient to assure that he has a direct stake in the outcome of the controversy. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Olitsky v. O'Malley*, 597 F.2d 295 (1st Cir.1979); *Rodos v. Michaelson*, 527 F.2d 582 (1st Cir.1975). An individual has no standing to sue, nor to recover damages for the deprivation of another's constitutional rights. *O'Malley v. Brierley*, 477 F.2d 785, 789 (3rd Cir.1973); *Packish v. McMurtie*, 539 F.Supp. 548 (D.C.Mass.1982); *Jenkins v. Carruth*, 583 F.Supp. 613 (D.C.Tenn.1982), *aff'd.* 734 F.2d 14 (6th Cir.1984).

Though plaintiff, Rosario Nevarez, is the sole plaintiff in this action to have suffered a deprivation of his federal rights, his wife, Elsie Nieves, claims to have standing on several grounds. First, she argues she has a right to recover damages for the injury she suffered due to the violation of her husband's constitutional rights. This argument is in direct conflict with settled law. *See O'Malley, supra; Packish, supra; Jenkins, supra.* It is rejected without further discussion.

Next, plaintiff states she has a tort claim action against defendants under Article 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A. sect. 5141, and 32 L.P.R.A. sect. 3083, and, therefore, has standing under pendent jurisdiction and 42 U.S.C. sect. 1988. Standing based on pendent jurisdiction is rejected. Plaintiff's failed to plead any action based on the Civil Code of Puerto Rico or the Puerto Rico Constitution in the complaint. The sole legal theory for recovery in this action is the civil rights statute, 42 U.S.C. sect. 1983. Hence, pendent jurisdiction is not possible.

Plaintiff's final attempt to assert her standing to sue in this case is based on 42 U.S.C. sect. 1988. This provision reads in pertinent part:

The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this Title, and of Title "CIVIL RIGHTS," and of Title "CRIMES," for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause ...

Plaintiff argues, in essence, that section 1988 applies in this case because the civil rights statute, section 1983, does not "furnish suitable remedies and punish offenses against law." Since the law of Puerto Rico provides plaintiff with a remedy for defendants' actions, *see* Art. 1802, 31 L.P.R.A. sect. 5141 and 32 L.P.R.A. sect. 3083, she claims to have standing pursuant to section 1988 to recover damages for the deprivation of her husband's civil rights. This argument is defeated by absence in the complaint of any claim under local law for which plaintiff's wife would have a cause of action.

Even if plaintiff had properly plead a cause of action under the law of Puerto Rico, section 1988 could not be used as a

vehicle to obtain standing. The purpose of the applicable portion of section 1988 was explained in *Brazier v. Cherry*, 293 F.2d 401 (5th Cir.1961):

> It reflects a purpose on the part of Congress that the redress available will effectuate the broad policies of the civil rights statutes. If the federal law is 'suitable to carry the [policy] into effect' resort to local law is not required.

The fundamental policies behind section 1983 are twofold: to deter unconstitutional acts committed under state law and to compensate the injured party. *Robertson v. Wegmann*, 436 U.S. 584, 590–91, 98 S.Ct. 1991, 1995–96, 56 L.Ed.2d 554 (1978). Section 1988 was specifically addressed to and has been used almost exclusively in situations where a civil rights violation results in death or when a plaintiff dies in the course of litigation. *See, Robertson, supra; Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir.1984); *Hall v. Wooten*, 506 F.2d 564 (6th Cir.1974); *Mattis v. Schnarr*, 502 F.2d 588 (8th Cir.1974); *Brazier, supra*. Since section 1983 has been interpreted to confer standing on the individual alone whose civil rights were violated, in those situations where death occurs, either prior to or during litigation, the violation would go undeterred and uncompensated if the courts did not have authority to look to the local wrongful death or survivorship statute. In these cases a resort to local law is necessary to further the policies of the civil rights statutes.

In the present action, however, the purpose of section 1983 to deter and compensate civil rights violations is being met and there is no need to consider local law. Guillermo Rosario Nevarez, whose constitutional rights were deprived, is alive and is an active plaintiff in this action to assure that his rights are vindicated. There is no reason to look to local law in this action. Section 1988 was intended to authorize a remedy for a civil rights violation which would otherwise go unremedied. It was not intended to authorize a windfall recovery for civil rights violations whenever local law would provide a remedy for the defendant's actions.

■ The conjugal partnership of Guillermo Rosario Nevarez and Elsie Nieves is also a named plaintiff in this action. Section 1983 provides that any "citizen" or "other person" can bring a claim for deprivation of their constitutional rights. A non-incorporated association or organization is considered an "other person" within the meaning of section 1983 and may file a claim provided it can establish standing to sue. *Warth v. Seldin, supra*, 422 U.S. at 511, 517, 95 S.Ct. at 2211, 2215; *Advocates For The Arts v. Thomson*, 532 F.2d 792 (1st Cir.1976). By analogy, the conjugal partnership as an independent entity under the laws of Puerto Rico, is a "person" for section 1983 purposes and would have the right to be a plaintiff in a civil rights action, if it has standing.

■ *Warth v. Seldin, supra*, defines the perimeters of standing under section 1983 for an unincorporated association. The association will have standing of its own right if it has suffered direct injury due to a deprivation of its constitutional rights or immunities. *Warth*, 422 U.S. at 511, 95 S.Ct. at 2211. In the absence of direct injury, an association will not have standing on its own, but may have standing in a representative capacity. To sue as a representative, the association must show that its members, or any one of its members are suffering or are threatened by an injury of the sort that makes out a justiciable claim. An association's right to sue in a representative capacity further depends on the nature of the relief sought. Generally, standing is proper only if a declaratory judgment, injunction or other prospective relief is sought. *Warth*, 422 U.S. at 511, 95 S.Ct. at 2211; *National Motor Freight Traffic Assn.*, 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963). In such a case, it can reasonably be assumed that the remedy, if granted, will inure to the benefit of all the association members. *Id.* However, when the claim is for damages to relieve the injury of a particular member, standing will not be granted to the association in a representative capacity. *Id.* In

this case, judicial relief would not benefit the association membership as a whole. Recovery belongs to the individual injured party, who has the right to file suit on his own behalf.

In the present case, the conjugal partnership of Guillermo Rosario and Elsie Nieves has not been directly injured and has no standing of its own right. In addition, we find the partnership is not a proper party in a representative capacity, even though one of its members, Guillermo Rosario, has suffered injury-in-fact due to a deprivation of his constitutional rights. The relief sought in this case is both for monetary damages and injunctive relief. An association, or, as in this case, the entity of the conjugal partnership, has no standing in a representative capacity to bring a claim for monetary relief.

Furthermore, the purpose of including the conjugal partnership as plaintiff in this case is not to vindicate the civil rights of its member, Guillermo Rosario. Mr. Rosario is a plaintiff himself and fully capable of advocating his rights on his own behalf. The only purpose of including the partnership would be to assure that the final judgment is properly divided under the law of Puerto Rico between damages for mental and physical suffering, which belong to Guillermo Rosario personally, and damages for loss of income which belong to the conjugal partnership. *See Robles Ostolaza v. U.P.R.*, 96 P.R.R. 570 (1968); Article 1301 of the Civil, 31 L.P.R.A. 3641. There is no need to include the partnership for this reason.[16] Article 93 of the Civil Code, 31 L.P.R.A. 286, provides that "either spouse may legally represent the conjugal community." As plaintiff in this action, Guillermo Rosario serves as representative of the conjugal partnership to protect its

interests. The judgment in this case clearly delineates the portion attributed to lost income. Under the law of Puerto Rico, this portion accrues automatically as property of the conjugal partnership. Civil Code Article 1301, 31 L.P.R.A. 3641.

## CONCLUSION

### A. DAMAGES

Plaintiff Guillermo Rosario Nevarez is entitled to recover from defendants Jaime Torres Gaztambide and Cosme Hernández-Silva jointly, the amount of $27,596.00 for loss of wages, the exacerbation of his asthmatic condition, and mental and emotional distress resulting from the violations of his constitutional rights.

Punitive damages are assessed against both Cosme Hernández-Silva and Jaime Torres Gaztambide in the amount of $10,000.00 and $5,000.00, respectively because of their callous disregard for plaintiff's First Amendment rights and to deter political discrimination.

### B. INJUNCTIVE RELIEF

Equitable relief is a component of a Section 1983 action. Plaintiff has established that injunctive relief is just and proper in this case. Accordingly, it is hereby ORDERED, ADJUDGED AND DECREED that defendants,[17] their successors in office, agents, attorneys, employees, and any other person acting on behalf or in concert with the defendants, reinstate plaintiff forthwith to his former position of Regional Director, Arecibo Region, in the Regional Housing Administration, at the same salary and with the same fringe benefits he would be earning and receiving, but for his demotion to Rural Community Administration Technician, and with the same func-

---

16. The court notes that the wives of defendants Torres Gaztambide and Hernández Silva, and the conjugal partnerships between them are necessary party defendants to assure proper execution of the judgment and to provide said wives to defend their rights in the community property. *See, Pauneto Rivera v. Núñez Borges*, 84 JTS 62 (1984); *Asociación de Propietarios v. Santa Bárbara*, 112 D.P.R. 33 (1982); *Sepúlveda v. Maldonado Febo*, 108 D.P.R. 530 (1979); *Lugo*

*Montalvo v. González Mañón*, 104 D.P.R. 372 (1975).

17. Subsequent to trial defendant Torres-Gaztambide resigned and was replaced by Ariel Nazario. A successor in office is automatically substituted under F.R.C.P. 25(d); *Maria Santiago v. Cruv*, 554 F.2d 1210, 1213 (1st Cir.1977).

tions and authority pertaining to other Regional Directors similarly situated.

## C. ATTORNEYS FEES

■ As a prevailing party, plaintiff is entitled to attorneys fees pursuant to the Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988. The overriding purposes of the Act is the encouragement of private enforcement of the civil rights laws to fully vindicate federal constitutional guarantees. Accordingly, plaintiff is to submit a verified fee application within 15 days. See *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945 (1st Cir.1984).

## D. PLAINTIFF'S WIFE CLAIM

The Section 1983 claim of Elsie Nieves, plaintiff's wife, is hereby ordered DISMISSED.

The Clerk shall enter judgment accordingly.

IT IS SO ORDERED.

### AMENDED APPENDIX A

### LIST OF DUTIES OF RHA REGIONAL DIRECTORS

(Taken from the OP-16 Letter) *

1. Administers, directs, coordinates and supervises the operational and administrative activities of the Rural Housing Administration at a District Level.

2. Attends periodic meetings at the Central Office of Rural Housing Administration with the Deputy Executive Director to implement the program of distributions of lots.

3. Orient the officers and citizens about Law No. 1, Law No. 26, Law No. 35, Law No. 3 and their respective Rules and Regulations.

4. Visits the different local offices and the Communities of the different Areas of the District, to supervise and evaluate the field operations.

5. Receives, checks, and transmits application for undistributed or vacant lots, or through the sale of improvements, cessions, surrogations, segregations, use changes and *lease of churches (sic) covenants and residences.*

6. Organizes training at the District Level for the personnel under his supervision.

7. Coordinates with Municipal Authorities in his area, the activities related with the distribution of lots, inaugurations, homesteaders census, community necessities and all those matters related with Rural Housing Administration.

8. Directs, supervises and certifies the investigation, and lists of candidates in the lot distribution program.

9. Attends to complaints and referrals from mayors, legislators, commissions from the community, and other persons that visit the office requesting the services of the agency.

10. Coordinates with the Supervisor of Collections the activities related with the signing of Deeds for property titles corresponding to his district.

11. Coordinates and supervises the surveyors in the work related to segregations, problems, redesigning, and redistribution of lots and submits recommendations to the Engineering Division and the reinstallation of homesteaders in meritorious cases.

12. Evaluates the work performed by the personnel and submits recommendations to the Central Office.

13. Serves as liaison agent between the Central Office of Rural Housing Administration and other governmental agencies at the district level.

14. Writes reports related to the duties he performs.

---

* The Court finds that the OP-16 letter signed by RHA Regional Directors concluded with the "catch-all" item number 18. Eulalio Romero Arroyo, former RHA Regional Director of the Arecibo region, testified that he signed the OP-16 and that the duties listed concluded with number 18.

15. Offers recommendations to the Executive Director of R.H.A. for the improvement of the services that the agency offers.

16. Represents the agency in lawsuits and other legal matters, rules, and norms of the agency.

17. Participates in the selection and recruiting of new personnel at the district level.

18. Perform other related duties assigned to him.

### APPENDIX B

### CERTIFICATION

This is to certify that since the change in administration that occurred in the Commonwealth of Puerto Rico on January, 1985, approximately 200 cases have been filed by employees (or former employees) of agencies of the Commonwealth of Puerto Rico, who claim violations of their constitutional rights due to demotions, transfers or dismissals, under 42 U.S.C. 1983.

At San Juan, Puerto Rico, this 14th day of March, 1986.

RAMON A. ALFARO
Clerk of the Court
/s/ Juan M. Masini-Soler
BY: Juan M. Masini-Soler
Chief Deputy Clerk