**Candelaria CUELLO–SUAREZ, et al., Plaintiffs,**

v.

**AUTORIDAD DE ENERGIA ELECTRICA DE PUERTO RICO, Defendant.**

**Civ. No. 88–0133 (PG).**

United States District Court, D. Puerto Rico.

April 25, 1990.

Santiago Villalonga, Santurce, P.R., for plaintiffs.

Karen M. Loyola–Peralta, San Juan, P.R., for defendant.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge.

The matter pends before the court on defendant's August 11, 1988, motion to dismiss and plaintiffs' belated opposition thereto. Once before we have treated defendant's motion to dismiss as one for summary judgment and will do so again today. *See Candelaria Cuello–Suárez v. Autoridad de Energía Eléctrica de Puerto Rico*, No. 88–133, 1989 WL 5863 (D.P.R. Jan. 20, 1989) (LEXIS, Genfed library, Dist file). Rather than revisiting our previous narrative of the undisputed facts underlying this litigation, however, we refer the parties and any interested reader to our earlier opinion, noting only that for our present purposes it suffices to recall that plaintiff Candelaria Cuello–Suarez, a Dominican national residing in the Commonwealth of Puerto Rico, instituted this action on January 26, 1988, against the Puerto Rico Electric Power Authority ("PREPA") under Title VII of the Civil Rights Act of 1964,[1] and Law 100 of June 30, 1959,[2] alleging that she had been discriminated against because of her national origin and seeking promotion, backpay, and punitive as well as compensatory damages. In what pertains to the legal issues raised by the parties to this suit, closer scrutiny has moved us to reconsider some of our earlier findings and we thus turn to frame those issues in finer detail.

Defendant's motion to dismiss rests on a number of independent grounds. First, defendant alleges that the allegations presented in the complaint are conclusory in nature and do not provide an adequate basis for a civil rights claim. Secondly, it is contended that the complaint fails to state a claim of racial discrimination under § 1981 inasmuch as it is solely based on the employee's nation or place of origin and not on her race. Moreover, PREPA argues that, there being no basis for any of plaintiffs' federal law claims, this court's exercise of pendent jurisdiction over the state law claims should be declined. As if not to leave any stone unturned, defendant fur-

---

1. 42 U.S.C. § 1981, as amended.

2. P.R.Laws Ann. tit. 29, § 146 et seq.

ther argued that plaintiffs' claim for punitive damages should be dismissed on the additional ground that punitive damages are not recoverable against a public corporation as a matter of law and, finally, that the Title VII claim was altogether barred for failure to meet jurisdictional and filing requirements.

After what appeared to be more than ample time for plaintiffs to oppose defendant's motion to dismiss and no such action having taken place, on January 20, 1989, this court filed an opinion and order granting the motion on the basis of the first three arguments which have been succinctly outlined above. It was later called to our attention that plaintiffs had previously been granted additional time in which to complete discovery and oppose defendant's motion and in view of that fact on February 16, 1989, our opinion and order of January the 20th was vacated and a new timetable was set. After some additional skirmishing, not here pertinent, on November 28, 1989 plaintiffs filed their motion in opposition to defendant's motion to dismiss alleging that the complaint did state a claim under § 1981, that punitive damages were in fact recoverable against a public corporation, and that defendant's argument to the effect that there could not exist discrimination against plaintiffs based on national origin was so meritless "as to require no attention."[3]

Five are thus the issues we must address at this juncture. Tracing the order in which they were presented by the defendant in its motion to dismiss, we discuss them *seriatim.*

## I

■ Plaintiffs' motion in opposition to defendant's motion to dismiss has moved us to reevaluate our earlier determination with respect to the adequacy of the civil rights claim and we now hold that plaintiffs have validly stated a claim under 42 U.S.C. § 1981 as a matter of federal plead-

ing law. We elaborate on the point but briefly.

In the civil rights context, our First Circuit has stated that although a claim is capable of being supported by any conceivable set of facts, plaintiffs must provide at least a minimal outline as to who did what to whom and why. *Dewey v. University of New Hampshire,* 694 F.2d 1 (1st Cir.1982), *cert. denied,* 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983). *See also Kadar Corp. v. Milbury,* 549 F.2d 230 (1st Cir. 1977). It must also be remembered, however, that the Supreme Court has rejected the approach which would have made pleading a "game of skill in which one misstep by counsel may be decisive to the outcome," and accepted the principle "that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). In that same case, the Court added that such "simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." *Id.,* at 47–48, 78 S.Ct. at 102–03.

Although the call is close, we opine that in the case at bar plaintiffs have met the "minimal outline" requirements established by the First Circuit: through both the pleadings and, particularly, the discovery, it has been established that plaintiff Candelaria Cuello–Suarez, a Dominican national, has applied for a great number of management positions within the PREPA (seventy-seven through her last count) which she had presumably been qualified for and which have allegedly been filled with less qualified applicants. Although it is true that many other reasons could exist that would account for such a pattern of exclusion, it is no less reasonable to infer that the fact that she is from the Dominican Republic could very well be the motivating factor behind the rejections. And although

---

**3.** Aside from the fact that we are wholly unimpressed by plaintiffs' show of confidence, we advise counsel that in the future such nonchalance in regard to the legal issues which pend

before the court could and will result in the assessment of sanctions against the party and its legal representation.

we do recognize that additional facts which would have supported the conclusion that the plaintiff's nationality was in fact the dominant motive behind the exclusions should have been specifically pleaded and must be subsequently proven,[4] the inordinate number of instances in which plaintiff has applied for the positions and been rejected and the interests of justice[5] move us to allow this case to proceed for a decision on its merits.

## II

It is next contended that plaintiffs' complaint should be dismissed for failure to state a claim of racial discrimination from the substantive point of view given the fact that it is solely based on the employee's nation of origin and not on her race. As defendant elaborated on this argument, however, two somewhat distinct lines of reasoning emerged. On the one hand, the most natural construction of the argument first asserted that § 1981 encompasses only claims of racial discrimination, not protecting against discrimination on grounds of religion, sex, age, *national origin*, or *place of birth, see Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1986), and then submitted that plaintiff's allegations to the effect that she had been discriminated against because of the fact that she was a *"Dominican national"* and *"on the basis of her place of birth"*[6] therefore did not state a claim under § 1981. On the other hand, it was argued that discrimination against a citizen of the Dominican Republic by or in favor of a citizen of Puerto Rico was not redressable under the federal civil rights laws due to the fact that they both belonged to the larger class of individuals commonly referred to as Hispanics. To allege that she was discriminated against because she was a Dominican national, the thesis runs, would constitute an allegation on the basis of her place of birth (the Dominican Republic), not on her race

(the Hispanic race), and therefore not actionable under § 1981. In our previous opinion we had occasion to address the first of these two arguments. Today we review briefly that earlier determination and present our position as to the second one.

█ We echo, of course, the Supreme Court's conclusion to the effect that in drafting § 1981 "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis*, 481 U.S. at 613, 107 S.Ct. at 2028. In order to prove racial discrimination within the meaning of § 1981, then, a plaintiff must prove that she was discriminated against on the basis of her ancestry or ethnic characteristics and not solely on the place or nation of her origin. *Id.* In drawing fine lines like these, however, it is evident that special care must be exercised. As the concurring opinion of the Honorable Justice Brennan in *Saint Francis* makes clear:

... the line between discrimination based on "ancestry or ethnic characteristics" ... and discrimination based on "place or nation of ... origin," ... is not a bright one. It is true that one's ancestry—the *ethnic group* from which an individual and his or her ancestors are descended— is not necessarily the same as one's national origin—the country "where a person was *born*, or, more broadly, the country from which his or her ancestors *came*." ... Often, however, the two are identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group.... I therefore read the Court's opinion to state only that discrimination based on *birthplace alone* is insufficient to state a claim under § 1981.

*Saint Francis*, 481 U.S. at 614, 107 S.Ct. at 2028 (citations omitted and emphasis on the original). Therefore, where, as here, the

---

**4.** Such as, to name a couple, racial remarks made by officials of the defendant or that the positions were filled exclusively with persons of Puerto Rican descent.

**5.** Fed.R.Civ.P. 8(f): "All pleadings shall be construed as to do substantial justice."

**6.** See answers to interrogatories Nos. 8 and 18.

plaintiff's race and her national origin are "identical as a factual matter" and the pleadings and the answers to the interrogatories make it very clear that she is not only alleging discrimination on the basis of her place of origin without regard for her ethnic background, we must conclude that plaintiffs' complaint validly states a claim of racial discrimination under § 1981. At least at these stage of the proceedings, we refuse to give plaintiff's allegations so narrow a reading. The *St. Francis* decision intends to make sure that there is a racial animus behind the discrimination, that the person is being discriminated against because she is of a particular race and not just because she or her ancestors were born in or came from a particular place without regard for their ethnic background. It is clear in this case that the required racial animus, at the very least, has properly been alleged.

■ We are left, then, with the question of whether discrimination against a citizen of the Dominican Republic by or in favor of a citizen of Puerto Rico is actionable under § 1981. In this latest quest we must once again resort to the Supreme Court's decision in *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1986). There, the Supreme Court set out to determine whether white anglo-americans could discriminate against persons of arabian ancestry[7] notwithstanding the fact that at the present time they could both be considered to be members of the Caucasian race. While conceding that discrimination within the same race, ie., by one Caucasian against another, was not actionable under § 1981, *Id.* at 609–610, 107 S.Ct. at 2026–27, the Court nevertheless explained that the proper inquiry in this type of cases was not whether the particular race could be considered a separate race by today's standards but whether they constituted a group of people that Congress intended to protect at the time § 1981 was enacted into law.

*See also Shaare Tefila Congregation v. Cobb.*, 481 U.S. 615, 617, 107 S.Ct. 2019, 2021, 95 L.Ed.2d 594 (1986). After reviewing the statute's legislative history and the concept of race as it was understood in the nineteenth century, the Court concluded that even though Arabs could be considered to be Caucasians today, in the nineteenth century they had to be considered to be "genetically part of an ethnically and physiognomically distinctive subgrouping of homo sapiens." *Saint Francis*, 481 U.S. at 613, 107 S.Ct. at 2028, quoting from the Court of Appeals' opinion, *Saint Francis College v. Al–Khazraji*, 784 F.2d 505, 517 (1986). Thus, a person of Arabian ancestry could be protected from racial discrimination by other Caucasians under § 1981.

While it would not pay to search for direct references to Dominican nationals in the congressional debates of the nineteenth century,[8] we believe the general thrust of the legislative history of the Civil Rights Acts was broad enough to allow us to conclude that had the 41st Congress faced the precise inquiry we face today they would have concluded that § 1981's protection also extended to citizens of the Dominican Republic as an "ethnically ... distinctive subgrouping of homo sapiens." Even nowadays, it cannot seriously be disputed that Dominican nationals, generally speaking, possess certain distinctive characteristics which separate them from other subgroups of people within the Hispanic race and could serve to make them the targets of racial discrimination. Perhaps more importantly, it is also clear that the protection afforded by § 1981 must be interpreted in broad terms. The words of the late Senator Stewart during the debates that took place prior to the enactment of the Civil Rights Acts of 1870 are illustrative in this regard:

I do here insist that that provision shall go on this bill, and that the pledge of this

---

**7.** Petitioner in that case was a United States citizen who had been born in Iraq. *See Saint Francis*, 481 U.S. at 606, 107 S.Ct. at 2024.

**8.** During the nineteenth century, the Dominican Republic was subjected alternatively to Spanish

rule, French rule, and a succession of dictators which ruled after several slave revolts overturned existing governments. *See* 5 Encycl. Brit. 949 (1984).

nation shall be redeemed, that we will protect Chinese aliens *and any other aliens whom we allow to come here,* and give them a hearing in our courts; let them sue and be sued; let them be protected by all the laws and the same laws that other men are. That is all there is in this provision.

Cong. Globe, 41st Cong., 2d Sess., 3658 (1870) (emphasis supplied). Finally, we note that the proscribed discrimination need not be by or in favor of a member of the Caucasian race either,[9] as the Supreme Court made clear that the House had described part of the authority of § 1981 as declaring "that the States shall not hereafter discriminate against an immigrant from China and in favor of the immigrant from Prussia, nor against the immigrant from France and in favor of the immigrant from Ireland." *Id.,* at 3871, quoted in *Saint Francis,* at 613, 107 S.Ct. at 2028. Therefore, we conclude that although Dominicans and Puerto Ricans can both be considered to be part of the Hispanic race at the present time, the protective arm of § 1981, as envisioned by Congress in 1870, shields the one from any act of discrimination by or in favor of the other.

### III

We now turn to determine whether to exercise jurisdiction over plaintiffs' pendent state claims. Defendant submits that the differences in burdens of proof and available remedies that exist between Title VII and Puerto Rico's Anti Discrimination statute, as well as the fact that a surerfooted reading of the applicable law can be obtained in the local courts, argue in favor of declining our exercise of pendent jurisdiction in the instant case. We do not agree with these contentions and, therefore, plaintiffs' pendent state claims will be heard. Our reasoning follows.

■ The doctrine of pendent jurisdiction "is a judge-made doctrine of expediency

and efficiency derived from the general Art. III language conferring power to hear all 'cases' arising under federal law or between diverse parties." *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104, 104 S.Ct. 900, 910, 79 L.Ed.2d 67 (1984). "Pendent jurisdiction, in the sense of judicial power, exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under this Authority ...,' U.S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' " *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The test to determine whether a court should exercise pendent jurisdiction was initially set forth by the Supreme Court in *Gibbs.* It requires us to determine, first, whether we have authority, or "constitutional power," *see Jones v. Intermountain Power Authority,* 794 F.2d 546, 549 (10th Cir.1986), over the state law claims, and, second, whether in our discretion we should entertain them.

Authority to exercise jurisdiction over state law claims exists if the federal claim has "substance sufficient to confer subject matter jurisdiction on the court," and the state and federal claims "derive from a common nucleus of operative fact" so that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138.[10] A district court lacks subject matter jurisdiction when the federal claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial or frivolous." *Bell v. Hood,* 327 U.S. 678, 682–683, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). In what pertains to the "common nucleus of operative fact" aspect of the test, a loose factual connection between the

---

9. Even discrimination against a white person falls within the protection of the Act, *see McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (involved alleged discrimination against a white person in favor of a black).

10. For a case not deemed to meet the "common nucleus of operative fact" aspect of the test *see Ferguson v. Mobil Oil Corp.,* 443 F.Supp. 1334 (S.D.N.Y.1978).

claims has generally been held sufficient to satisfy this requirement. *See* Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction*, § 3657, pp. 445–447, *Ritter v. Colorado Interstate Gas Co.*, 593 F.Supp. 1279 (D.Col.1984).

■ Turning to the second leg of the test, we note that the doctrine of pendent jurisdiction is one of judicial discretion, not of plaintiff's right, and that its justification lies in considerations of judicial economy, convenience, and fairness to the litigants. In exercising our discretion we must consider (a) whether the above stated factors would be served by trying the federal and state claims in a single proceeding; (b) whether the pendent claims present unsettled questions of state law or a surer-footed reading could be obtained in a state court; (c) whether the state issues predominate in terms of proof, scope of issues raised, or comprehensiveness of remedy sought; and (d) whether jury confusion is likely to result from the divergent theories of relief.[11] *Gibbs*, 383 U.S. at 726–727, 86 S.Ct. at 1139.

In *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) the Supreme Court added another level of analysis to the question of whether a federal court has authority to entertain state law claims:[12]

"... the test of *Gibbs*, does not end the inquiry into whether a federal court has power to hear the nonfederal claims along with the federal ones. Beyond this constitutional minimum, there must be an examination of the posture in which the nonfederal claim is asserted and of the specific statute that confers jurisdic-

tion over the federal claim, in order to determine whether 'Congress in [that statute] has ... expressly or by implication negated' the exercise of jurisdiction over the particular nonfederal claim."

437 U.S. at 373, 98 S.Ct. at 2402 (quoting from *Aldinger v. Howard*, 427 U.S. 1, 18, 96 S.Ct. 2413, 2422, 49 L.Ed.2d 276 (1976). The fact that *Owen* was a case involving pendent parties and not pendent claims has given rise to some debate over whether its holding applies to pendent claim cases as well. *See Taylor v. State of R.I. Dept. of Mental Health*, 726 F.Supp. 895, 898–900 (D.R.I.1989), *Jones*, 794 F.2d at 551–552. We are of the opinion, however, that the language in *Owen* is broad enough to enable us to conclude that the Supreme Court intended its holding to apply to both types of situations. We also agree with the *Jones* court that holding otherwise "ignores the fundamental principle that subject matter jurisdiction of the federal courts is limited by Article III of the Constitution and whatever enabling legislation Congress chooses to enact and that federal courts must scrupulously observe the precise jurisdictional limits prescribed by Congress." *Jones*, 794 F.2d at 552. Thus, a third leg to the test requires us to determine whether the statute on which federal jurisdiction is predicated either expressly or by implication excludes the state claim from federal court jurisdiction.

■ Having set the stage thusly we proceed to apply these principles to the situation at hand. There can be little doubt as to the fact that the court possesses subject matter jurisdiction over plaintiffs' federal law claims. These claims arise under Title

---

**11.** Many district courts have declined, in their discretion, to exercise pendent jurisdiction over state claims in Title VII cases. These include *Curtin v. Hadco Corp.*, 676 F.Supp. 408 (D.N.H. 1987), *Lazic v. University of Pennsylvania*, 513 F.Supp. 761 (E.D.Pa.1981), *Morgan v. Sharon Pennsylvania Board of Education*, 445 F.Supp. 142 (W.D.Pa.1978), *Johnson v. University of Pittsburgh*, 435 F.Supp. 1328 (W.D.Pa.1977), *Haroldson v. Hospitality Sys., Inc.*, 596 F.Supp. 1460 (D.Col.1984), *Gerlach v. Michigan Bell Telephone Co.*, 448 F.Supp. 1168 (E.D.Mich.1978), *Van Hoomissen v. Xerox Corp.*, 368 F.Supp. 829 (N.D.Cal.1973), *Mongeon v. Shellcraft Industries, Inc.*, 590 F.Supp. 956 (D.Vt.1984), *Barbetta v.*

*Chemlawn Services Corp.*, 669 F.Supp. 569 (W.D.N.Y.1987).

**12.** *See Ortiz v. United States*, 595 F.2d 65, 71 n. 9 (1st Cir.1979) (agreeing in dictum that when *Owen* is taken into account a federal court is required to consider whether Congress has manifested an intent to negate jurisdiction in pendent claim cases), *Jones*, 794 F.2d at 551–552, *United States ex rel. Hoover v. Franzen*, 669 F.2d 433, 440 (7th Cir.1982), *Ambromovage v. United Mine Workers*, 726 F.2d 972, 989–991 (3rd Cir. 1984).

VII of the Civil Rights Act of 1964 and are substantial, material, and not made solely for the purpose of framing a federal question which would open the doors of the federal court for the plaintiffs. Furthermore, both the federal law and state law claims derive from the same acts, namely, the seventy-seven or so rejections suffered by plaintiff Candelaria Cuello Suarez during her quest for a promotion within the PREPA, and it is therefore to be expected that plaintiffs try them all in a single case. The court accordingly concludes that the required constitutional power over plaintiffs' pendent state claims exists.

■ In exercising our discretion, we concentrate our discussion on the factors raised by the defendant in its motion to dismiss. As noted above, defendant is of the opinion that uncertainty as to the applicable state law, as well as differences in the burdens of proof which could result in jury confusion and double recovery on alternative theories of relief, require that the state claims be reserved for disposition in the local courts. We are of the opinion that none of these factors, considered in isolation, warrants that we decline to hear plaintiffs' pendent state claims, specially when considered against the "long-standing presumption in favor of pendent jurisdiction and district courts' broad discretion to assume jurisdiction over pendent claims." *Jones,* 794 F.2d at 552. Neither is the cumulative effect of each of defendant's anxieties deserving of a different result. Here, as in so many other cases, the whole is not greater than the sum of its parts. We explain briefly.

Uncertainty as to the applicable state law, if once a momentous reason for declining to exercise pendent jurisdiction over Puerto Rico Law 100 claims in Title VII cases, *see Guzmán Robles v. Cruz,* 670 F.Supp. 54 (D.P.R.1987), need worry us no

more as the Supreme Court of Puerto Rico recently dissipated most of the existing doubts over the provisions of Law 100 in *García Pagán v. Shirley Caribbean,* 88 J.T.S. 101 (1988). We thus reject this contention without further ado.

With regard to the prospect of jury confusion, we turn for guidance to the First Circuit's opinion in *Wildman v. Lerner Stores Corp.,* 771 F.2d 605 (1st Cir.1985). There, the First Circuit reviewed the decision of a district court faced with a similar situation and held that it had not abused its discretion in trying together plaintiffs' Age Discrimination in Employment Act[13] claim along with a Puerto Rico Law 100 claim even though different burdens of proof applied to the two.[14] The factors considered by the First Circuit were that the issue of liability was the same under all claims, that the district court carefully and correctly explained the burdens of proof applicable under both statutes, that written interrogatories were submitted to the jury for findings on each statute, and that the instructions were sufficient to enable the jury to cope with the different burdens of proof under federal and local law and apply them correctly. All these considerations would apply with equal force in the case at bar. *See also Prewitt v. Trustees of Boston University,* 891 F.2d 337 (1st Cir.1989) (affirming jury trial for state contract claims proceeding simultaneously with Title VII claims). Furthermore, juries in federal courts routinely hear cases presented under state statutes while a Title VII case is tried simultaneously to the court. *See Rosa v. Burns & Roe Services Corp.,* 726 F.Supp. 350 (D.P.R.1989) (exercising discretion to hear Puerto Rico Law 100 claim along with Title VII claim), *Flowers v. Rebo,* 675 F.Supp. 1165 (E.D.Ark.1987) (exercising discretion to hear claim for inten-

---

13. "ADEA," 29 U.S.C. § 621 et seq.

14. With regard to the relationship between the burdens of proof, we note that the situation at bar is identical to that confronted by the First Circuit in *Wildman.* While under Law 100 plaintiff enjoys a statutory presumption that she was discharged without good cause, thus placing the burden of proof on the defendant, *see*

*Ibañez v. Molinos de Puerto Rico,* 114 D.P.R. 42 (1983), both under ADEA and under Title VII the burden of proof is on the plaintiff at all times. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973), and *Abermarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

tional infliction of emotional distress under state law along with Title VII claim).[15] It is also well-settled that a Title VII claim may be joined with other federal claims even though they provide for a full range of legal and equitable remedies not available under it. *Jones*, 794 F.2d at 552. Thus, there is simply no basis for presuming that, after being properly instructed by this court, the jury will not be able to distinguish between the different standards of proof or that the different remedies available under Law 100 will affect the jury's treatment of the Title VII claim.

■ There being no impediment to our discretionary exercise of pendent jurisdiction in the instant case, we note that considerations of judicial economy, convenience and fairness to the litigants weigh heavily in favor of our exercise of pendent jurisdiction in the instant case.[16] The fact that Title VII claims can only be filed in the federal court, *see Valenzuela v. Kraft, Inc.*, 739 F.2d 434 (9th Cir.1984), also argues heavily in favor of allowing the Title VII claimant to join the state claims with the Title VII claims since holding otherwise would force plaintiffs to always have to bifurcate their claims. *Jones*, 794 F.2d at 552–553.[17] Where, as here, all claims are based on the same allegations of fact and refusal to exercise jurisdiction would force witnesses to testify twice in essentially duplicative proceedings, "the plaintiff should not be forced to sue simultaneously in two different courts." *Flowers v. Rebo*, 675 F.Supp. at 1168, *cf. Glezos v. Amalfi Ristorante Italiano*, 651 F.Supp. 1271, 1277 (D.Md.1987).

■ Finally, we express our opinion as to whether Congress, in enacting Title VII, intended to negate our exercise of jurisdiction over any pendent state claim. Courts that have declined to exercise pendent jurisdiction in Title VII actions on this the third prong of the *Gibbs–Aldinger–Owen* trilogy are of the opinion that (1) the statute's exclusion of other legal remedies,[18] and (2) its specific procedural limitations and intended expeditious manner of processing,[19] explicitly or implicitly signify a congressional intent to prohibit the exercise of pendent jurisdiction.[20] We find these arguments unpersuasive and

15. *See also Phillips v. Smalley Maintenance Services, Inc.*, 711 F.2d 1524 (1983) (district court did not abuse its discretion in exercising jurisdiction over pendent state claims of battery and tortious invasion of right of privacy in Title VII case). In *Grubb v. W.A. Foote Memorial Hospital, Inc.*, 741 F.2d 1486 (6th Cir.1984), on the other hand, the Appellate Court held that the district court had not abused its discretion in declining to hear pendent state claims in a similar Title VII case. Other Courts of Appeals, notably *Kitchen v. Chippewa Valley Schools*, 825 F.2d 1004 (6th Cir.1987), and *Thompkins v. Stuttgart School District*, 787 F.2d 439 (8th Cir. 1986), have sympathized with the rationale which tends to reject the exercise of pendent jurisdiction in Title VII cases but have distinguished them from cases where another federal claim allows for a trial by jury or for damages similar to those available under the state law claim.

16. Additionally, the federal law issue clearly constituting the mainstay of the action, the state law issues do not predominate over the federal claim and hence the fourth factor in our analysis is also met as. *Cf. Guyette v. Stauffer Chemical Co.*, 518 F.Supp. 521, 525 (D.N.J.1981).

17. *See also Aldinger v. Howard*, 427 U.S. 1, 18, 96 S.Ct. 2413, 2422, 49 L.Ed.2d 276 (1976) ("When the grant of jurisdiction to a federal court is exclusive ... the argument of judicial economy and convenience can be coupled with the additional argument that only in a federal court may all the claims be tried together.").

18. Specifically, the *Lim* court noted that the limited relief Congress has provided under Title VII is equitable in nature, including only reinstatement and backpay. *See* 42 U.S.C. § 2000e–5(g). Thus, legal remedies, such as compensatory damages, are not allowed under Title VII, *Muldrew v. Anheuser Busch, Inc.*, 728 F.2d 989, 992 n. 2 (8th Cir.1984).

19. The court in *Lim* also emphasized the facts that Congress directed that Title VII cases were to be tried before a judge, not a jury, and that such actions be expedited, 42 U.S.C. § 2000e–5(f)(4)–(5). Additionally, it noted that the statute empowered courts to refer the case to a master if it could not be tried within 120 days, 42 U.S.C. § 2000e–5(f)(5).

20. *See e.g., Frye v. Pioneer Logging Machinery, Inc.*, 555 F.Supp. 730 (D.So.Car.1983), *Bennett v. Southern Marine Management Co.*, 531 F.Supp. 115 (M.D.Fla.1982), *Jong-Yul Lim v. International Institute of Metropolitan Detroit, Inc.*, 510 F.Supp. 722 (E.D.Mich.1981), *Kiss v. Tamarac Utilities, Inc.*, 463 F.Supp. 951 (S.D.Fla.1978), *Abels v. State Farm Fire & Cas. Co.*, 596 F.Supp. 1461 (W.D.Pa.1984), *Hoferek v. University of*

present briefly the reasons why.

The limited relief argument ignores the Supreme Court's decisions holding that Title VII claims may be joined with other federal and state claims even though those claims provide for a jury trial and full range of legal as well as equitable remedies. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1973), *Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1974). In *Alexander,* 415 U.S. at 48–49, 94 S.Ct. at 1019–20, the Supreme Court expressed in clear and unequivocal terms:

> [T]he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII *and other applicable state and federal statutes.* The clear inference is that Title VII was intended to supplement, rather than supplant, existing laws and institutions regarding employment discrimination (emphasis supplied).

*See also Johnson v. Railway Express Agency,* 421 U.S. at 459, 95 S.Ct. at 1719. Perhaps most revealing is the fact that Congress has twice rejected proposed amendments which would have made Title VII an exclusive remedy. *See* 110 Cong. Rec. 13650–13652 (1964) (rejecting amendment which would have made Title VII the exclusive federal remedy for most unlawful employment practices) and H.R. 9247, 92 Cong., 1st Sess. (1971) (rejecting a similar amendment in connection with the Equal Employment Opportunity Act of 1972).[21] The only Appellate Court to have con-

sidered the issue of congressional intent reached an identical result. *Jones v. Intermountain Power Project,* 794 F.2d 546 (10th Cir.1986). With regard to the "expedite manner of processing" argument, we agree with the *Jones* court that such a notion is "too thin a thread on which to hang some imagined congressional intent to repeal pendent state claims." *Jones,* 794 F.2d at 552.

Thus, we hold, that once a plaintiff has placed his right foot inside the federal court doorway holding a Title VII claim in his right hand, nothing in the legislative history of that statute suggests that we are to deny entrance to the pendent Law 100 claim that he is holding in his left.

### IV

■■■ Defendant next submits that PREPA cannot be held liable for punitive damages under § 1981 because of the fact that it is a public corporation organized within the government of Puerto Rico. Plaintiffs, predictably, would beg to differ. While the question appears to be one of first impression, the Supreme Court faced a related issue in *City of Newport v. Facts Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) when it held that a municipality (or municipal corporation) is immune from punitive damages under § 1983.[22] Our treatment of this issue thus depends on whether the reasoning behind the *Newport* decision, holding municipalities immune from punitive damage liability under § 1983, applies with equal force to public corporations, specifically the

*Missouri,* 604 F.Supp. 938 (W.D.Mo.1985), *Chávez v. Guaranty Bank & Trust Co.,* 607 F.Supp. 484 (D.C.Col.1985), *Davis v. Devereux Foundation,* 644 F.Supp. 482 (E.D.Pa.1986), *Sampayo–Garratón v. Rave, Inc.,* 726 F.Supp. 18 (D.P.R.1989). Other districts courts, however, have found no such congressional intent, *see e.g., Taylor v. State of R.I. Dept. of Mental Health,* 726 F.Supp. 895 (D.R.I.1989), *Glezos v. Amalfi Ristorante Italiano, Inc.,* 651 F.Supp. 1271 (D.Md.1987), *Flowers v. Rebo,* 675 F.Supp. 1165 (E.D.Ark.1987), *Yousef v. Borman Foods, Inc.,* 667 F.Supp. 443 (E.D.Mich.1987), *Guyette v. Stauffer Chemical Co.,* 518 F.Supp. 521 (D.N.J.1981), *Kyriazi v. Western Electric Co.,* 476 F.Supp. 335 (D.N.J.1979).

21. Additionally, the report of the Senate Committee responsible for the Equal Employment Opportunity Act of 1972 explained that neither the "provisions regarding the individual's right to sue under Title VII, nor any other provisions of this bill, are meant to affect existing rights under other laws." S.Rep. No. 92–415, p. 24 (1971) (cited in *Alexander,* 415 U.S. at n. 9, 94 S.Ct. at 1019 n. 9).

22. In *Heritage Homes, Etc. v. Seekonk Water Dist.,* 670 F.2d 1 (1st Cir.1982), the First Circuit held that the *Newport* decision must be extended to suits brought under § 1981. *See also Poolaw v. City of Anadarko,* 738 F.2d 364 (10th Cir.1984).

Electric Power Authority, in Puerto Rico. We agree with the defendant that it does and therefore negate the possibility of punitive damage recovery in the instant case.

In *Newport,* the Supreme Court began its analysis by stating that "because the (Civil Rights) Act was designed to expose state and local officials to a new form of liability, it would defeat the promise of the statute to recognize any preexisting immunity without determining both the policies that it serves and its compatibility with the purposes of § 1983." 453 U.S. at 259, 101 S.Ct. at 2755. To evaluate a claim of immunity (i.e. against punitive damages) proffered by a government instrumentality (in that case a municipality), the Court applies a two-part approach: it first determines whether the history of the act suggests that Congress intended to abolish the doctrine of governmental immunity against the particular claim under consideration and, if the Court finds that it does not, whether considerations of public policy nevertheless mandate a contrary result. *Id.* We find that it is proper to apply this test to public corporations in Puerto Rico in view of the similarities that exist between the laws that created them and municipal corporations as well as the close ties that link public corporations to the central government.[23]

Turning to the first tine of this two-prong test, the Court noted that at the time "Congress enacted what is now § 1983, the immunity of a municipal corporation from punitive damages at common law was not open to serious question." *Id.* After reviewing the case law which strongly supported this point, the Court then proceeded "on the familiar assumption that (given the tradition behind municipal immunity against punitive damages) Congress would have specifically so provided had it wished to abolish the doctrine." 453 U.S. at 263, 101 S.Ct. at 2758. Finding no such evidence in the legislative history of the statute, the Court finally concluded that Congress did not intend to disturb the settled common-law immunity protecting sovereign bodies from punitive damage liability. That conclusion, it is needless to say, is binding for us in the instant case.

The second part of the inquiry required the Court to "examine the objectives underlying punitive damages in general, and their relationship to the goals of § 1983," *Newport,* 453 U.S. at 266, 101 S.Ct. at 2759, all this, of course, in the context of the inner workings of a municipal corporation. The Court first stated that punitive damages are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct in the future. *Newport,* 453 U.S. at 266–267, 101 S.Ct. at 2759. With regard to retribution, however, the *Newport* Court noted that the only party that would be "punished" by an award of punitive damages against a municipality would be the taxpayer, as such an award would undoubtedly be accompanied by an increase in taxes or a reduction in public services for the blameless citizens

---

**23.** The provision which gives life to municipal corporations states "[a] political and juridical entity known as a municipality is hereby created, ..., with ..., legal existence and personality, separate and independent from the Government of the Commonwealth of Puerto Rico." P.R.Laws Ann. tit. 21, § 2051. The Act that created the Electric Power Authority follows an analogous line as it provides that "[t]here is hereby created a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico," P.R.Laws Ann. tit. 22, § 193(a), and § 193(b) provides that "it is a corporation having legal existence and personality separate and apart from that of the Government." The next subsection emphasizes the close ties that link the Authority to the central government of

Puerto Rico when it reiterates that "[t]he Authority hereby created is and shall be a governmental instrumentality subject, as is provided herein, to the control of its governing board" (which is composed of members appointed by the Governor with the consent and advice of the Senate, *see Id.,* § 194). Additionally, both have perpetual existence (*see* P.R.Laws Ann. tit. 21, § 2051 and P.R.Laws Ann. tit. 22, § 196(a)), and, among others, the power to adopt a seal, to sue and be sued in all courts, to acquire and sell property, to issue bonds, and to enter into contracts or agreements, (*see generally* §§ 2054 and 196 respectively). We note in passing that the act allowing actions against the Commonwealth precludes the assessment of punitive damages in suits against the government. 32 L.P.R.A. § 3083.

who would in effect be paying for the bill. The retributive purpose, the Court concluded, would therefore not be advanced by exposing municipal corporations to punitive damages.

Turning to the deterrence aspect of punitive damages, the Supreme Court cited several reasons why it was of the opinion that the deterrence rationale of § 1983 did not justify making punitive damages available against a municipal corporation. First, it found it hard to believe that "municipal officials, even those at the policymaking level, would be deterred from wrongdoing by the knowledge that large punitive awards could be assessed based on the wealth of the municipality." *Newport*, 453 U.S. at 268, 101 S.Ct. at 2760. Then, it noted that, presuming, as it must, the responsibility and integrity of higher-level government officials, there was no reason to conclude that corrective action would not be forthcoming unless punitive damages could be assessed against the municipality. Finally, the Court noted that the fact that juries and courts could assess punitive damages against the offending official himself provided an effective way of directly advancing the public's interest in preventing repeated constitutional deprivations.[24] Hence, after balancing the benefits (which it characterized as being of a doubtful character) and the costs involved, the Court concluded that awarding punitive damages against municipalities under § 1983 posed a serious risk to both the financial integrity of these governmental entities and basic services they provide to the public at large and could therefore not be allowed.

Application of the foregoing analysis to Puerto Rico's public corporations mandates a parallel result. Punitive damages awards assessed against public corporations, like those assessed against municipal corporations, would ultimately be paid by the very same citizens they were supposed to serve. A review of the powers of the PREPA, P.R.Laws Ann. tit. 22, § 196, reveals that the collection of rates constitutes its main source of income, so that it is clear that the imposition of punitive damages in all Title VII suits would no doubt result in either an increase in rates or a reduction in the quality of the service provided. We are also of the opinion, for the very same reasons expressed by the Supreme Court in *Newport* in relation to municipal corporations, that awarding punitive damages against public corporations would not in any way serve as a deterrent against future misconduct. Compensatory damages are already available against public corporations and punitive damages against the individual wrongdoers themselves, *see Rosario Nevarez v. Torres Gaztambide*, 633 F.Supp. 287 (D.P.R.1986), so that the plaintiff can be duly compensated for his injuries while the public is left free of undue fiscal restraints. After all, a public corporation, like a municipality, "can have no malice independent of the malice of its officials," so that "[d]amages awarded for punitive purposes, ... [can] not sensibly [be] assessed against the governmental entity itself." *Newport*, 453 U.S. at 267, 101 S.Ct. at 2760.

We thus give credit where credit is due. Identical policy considerations being present, we find the *Newport* rationale to be directly applicable to the case at bar. Recovery of punitive damages against the Puerto Rico Electric Power Authority will therefore not be allowed.

## V

Lastly, defendant would have us dismiss the Title VII claim due to plaintiffs' alleged failure to meet jurisdictional time and filing requirements. In the alternative, defendant contends that even were this court to find that these jurisdictional requirements were met, all claims arising out of acts

---

**24.** The Court made two additional observations to further substantiate its concern for the possible strains on local treasuries and basic services when it noted that § 1983 liability had been greatly expanded in recent years to include a vast array of government activity, and that, since evidence of a defendant's financial condition was admissible as a measure of the amount of punitive damages that could be awarded, "the unlimited taxing power of a municipality may have a prejudicial impact on the jury, in effect encouraging it to impose a sizable award." *Newport*, 453 U.S. at 270, 101 S.Ct. at 2761.

which occurred more than a year prior to the filing of charges, that is to say, all claims arising out of acts which occurred between the years 1981 and 1985, are nevertheless time-barred by the state statute of limitations of one year which applies to § 1981 suits. Once again, the law is not on their side.[25]

Timely filing, let there be no doubt, is a jurisdictional prerequisite to the institution of a Title VII suit. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1972). To determine which filing requirements are to be applied in a given case, Title VII and the case law require us to distinguish between "deferral" states and "non-deferral states."[26] In "deferral" states, or states which have laws prohibiting the unlawful employment practice alleged and authorizing a local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, the requirements are that the plaintiff file charges with the Equal Employment Opportunity Commission within 300 days after the alleged unlawful employment practice took place and that she had received and acted upon the Commission's statutory notice of the right to sue. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974).[27] In "non-deferral" states, the corresponding time period is 180 days. *See generally*, 42 U.S.C. § 2000e–5(e). The Supreme Court has stated that these "limitation periods, while guaranteeing the protection of the civil

rights laws to those who promptly assert their rights, also protect employers from the burden of defending claims arising from employment decisions that are long past." *Delaware State College v. Ricks*, 449 U.S. 250, 256–257, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980).

Our First Circuit has held, however, that "if a Title VII ... violation is of a continuing nature, the charge of discrimination filed with the appropriate agency may be timely *as to all discriminatory acts encompassed by the violation so long as the charge is filed during the life thereof* or within the statutory period ... which commences upon the violation's termination." *Goldman v. Sears, Roebuck & Co.*, 607 F.2d 1014, 1018 (1st Cir.1979) (emphasis added). In search for a definition of what constitutes a continuing violation we need look no further than Judge Campbell's words in his *Goldman* opinion:

> To state such a continuing violation, however, a complaint must indicate that not only the injury, but the discrimination, is in fact ongoing.... A continuing violation is not stated if all that appears from the complaint is that the plaintiff continues to suffer from the ongoing effects of some past act of discrimination.... If [a] plaintiff mean[s] to claim that the later refusals formed part of a continuous chain of misconduct, it [is] incumbent upon him to allege facts giving some indication that [they] were themselves separate civil rights violations.

**25.** Once again, too, plaintiff's counsel failed to address this issue in his Motion in Opposition to Motion to Dismiss. We refer him to footnote 3 of this Opinion.

**26.** *See Astacio–Sánchez v. Fundación Educativa*, 724 F.Supp. 11 (D.P.R.1989) and *Sampayo–Garratón v. Rave, Inc.*, 726 F.Supp. 18 (D.P.R.1989) (holding Puerto Rico to be a "deferral" state).

**27.** The applicable provision, 42 U.S.C. § 2000e–5(e), also states that if the person aggrieved can and has initially instituted proceedings with a local agency with authority to grant or seek relief from the unlawful practice and the local proceedings conclude more than 30 days before the expiration of the 300 day term, then the party must filed charges before the

EEOC within 30 days of receiving notice of said termination. If they do not conclude 30 or more days before the expiration of the 300 day term, then that 300 day term is still applicable. It is also noteworthy that since the EEOC cannot proceed until either the state proceedings have ended or 60 days from the commencement of the state proceedings have passed, 42 U.S.C. § 2000e–5(c), the proceedings before the local authority, which in theory can be commenced within 300 days of the alleged violation, must in practice be filed within 240 so that the EEOC can proceed in time. *See Mohasco Corp. v. Silver*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1979). Finally, as *Mohasco* makes clear, a liberal interpretation of § 2000e–5(e) allows one agency to file the charges before the other "on behalf of" the injured party.

*Id.  See also,  Velázquez v. Chardón,* 736 F.2d 831, 832–833 (1st Cir.1984).  With these principles in mind, we turn to determine whether plaintiffs complied with Title VII's filing prerequisites.

■■■  Although not entirely clear, it appears that on or about July 29, 1987, plaintiff filed charges of racial discrimination before the Equal Employment Opportunity Commission.  At the very least, defendant, on page 21 of its motion to dismiss,[28] concedes that said action occurred sometime during 1987.  We gather from paragraphs 12 and 16 of her complaint that on or about that same date plaintiff also filed charges before the Director of the Anti–Discrimination Unit of the Department of Labor and Human Resources of the Commonwealth of Puerto Rico.  While we take into account the fact that charges were indeed filed before the appropriate agencies, we need not decide whether these filings fell within the statutory periods of § 2000e–5(e) for we find the doctrine of the "continuous violation" to be applicable to the instant case.  Without prejudging the merits of her contentions, we note that the plaintiff is not claiming that she is suffering from the ongoing effects of some past act of discrimination but is in effect alleging that during the course of seven years, from 1981 up to and including 1987, she applied on seventy-seven different occasions for a promotion within the Authority and was rejected on each and every occasion on the basis of her ancestry.[29]  These allegations, if proven, would constitute a number of separate civil rights violations which would amount to a continuous and ongoing pattern of discrimination.  This being so, as long as the charges were filed, as they indeed were, during the life of the discriminatory conduct, they would be timely as to all discriminatory acts encompassed by the violation.  *See Goldman v. Sears, Roebuck & Co.,* 607 F.2d at 1018.  This action is thus properly before the court.

28.  Dkt. entry # 19.

29.  We once again express our concern, however, that although the plaintiff has in fact complied with the minimal outline requirements of *Dewey v. University of New Hampshire,* 694 F.2d 1 (1st Cir.1982), *cert. denied,* 461 U.S. 944, 103

*Conclusion*

Defendant's motion to dismiss, viewed as one for summary judgment, is hereby GRANTED with respect to the aspect of punitive damage liability and DENIED in all other respects.

The trial date is hereby set for August 13, 1990, at 9:00 A.M.

IT IS SO ORDERED.

S.Ct. 2121, 77 L.Ed.2d 1301 (1983), she has been less than specific in stating some relevant facts such as, to name a few, the precise dates of the rejections and the supervisors who conducted the interviews.